# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHARLES SEEBACHER, on behalf of himself and all others similarly situated,<br><br>                                   Plaintiff,<br>    v.<br><br>ADELPHIA COMMUNICATIONS CORPORATION, JOHN J. RIGAS, TIMOTHY J. RIGAS, JAMES P. RIGAS, and MICHAEL J. RIGAS,<br><br>                                   Defendants. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF  FEDERAL SECURITIES LAW  JURY TRIAL DEMANDED** |

Plaintiff, individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his Class Action Complaint, alleges the following upon personal knowledge as to himself and his own acts and upon information and belief as to all other matters based upon the investigation made by and through his attorneys, which investigation included, among other things, a review of the public documents and news releases of Adelphia Communications ("Adelphia" or the "Company"), including its press releases and public filings with the Securities and Exchange Commission (the "SEC").

## <u>NATURE OF THE ACTION</u>

1.      Plaintiff brings this action as a class action on behalf of himself and all other persons who purchased the common stock of Adelphia during the period May 17, 1999 through and including May 14, 2002 (the "Class Period"), to recover damages caused by defendants' violation of the federal securities laws.

2.      The Company owns and operates cable television systems and local telephone operations in suburban areas of large and medium-sized cities in the United States.  Adelphia's operations consist of providing telecommunications services primarily over its broadband

networks.

3.      Throughout the Class Period, Adelphia reported strong financial results and continued growth of its broadband network.  All along, however, Adelphia failed to disclose billions of dollars in off-balance sheet debt in connection with a co-borrowing arrangement with certain managed entities.

4.      On March 27, 2002 Adelphia disclosed that certain managed entities had borrowed $2.284 billion against credit facilities that were co-guaranteed by Adelphia, but that the potential liabilities were not included in the Company's consolidated balance sheet for the period ending December 31, 2001.

5.      The Company further shocked the investment community by revealing during a conference call with Wall Street analysts on March 27, 2002 that some of the proceeds borrowed by the managed entities were advanced to the Rigas family  - Adelphia's founders and majority shareholders - which used the proceeds to purchase securities from Adelphia.

6.      Moreover, the Company also revealed that it might have to repay $500 million in unsecured bank debt of Adelphia Business Solutions, Inc. ("Adelphia Business"), which Adelphia has guaranteed, and which filed for bankruptcy protection under Chapter 11 on March 27, 2002.

7.      As a result of these revelations, the Company's stock price plummeted almost 18% or $3.69 on March 27, 2002 to close at $16.70.  Subsequently on March 28, 2002 the stock price fell an additional 11% or $1.80 to close at $14.90, erasing more than $1 billion in market capitalization.

8.      On April 1, 2002, Adelphia issued a press release announcing it was delaying the release of its 2001 year-end results "to review certain accounting matters relating to co-borrowing credit facilities which Adelphia is party to."

2

9.      On May 2, 2002, Adelphia announced that it would likely restate its financial results for 1999, 2000, and 2001.  Specifically, the Company reported that it has "tentatively concluded that it should reflect borrowings and related interest expense under certain co-borrowing arrangements…as liabilities in its consolidated financial statements, with a corresponding decrease in shareholders' equity."

10.     Then, on May 15, 2002 before the markets opened, defendant John J. Rigas resigned as Chariman and CEO of the Company and defendant Timothy Rigas also resigned as CFO, chief accounting officer, and treasurer the following day.  The Company announced that it would conduct an internal investigation into the issues raised in connection with the preparation of its 10-K statement - namely the public and private related-party dealings.  Moreover, the Company suspended an audit conducted by Deloitte & Touche, LLP, the Company's outside auditors.  Furthermore, the Nasdaq Nation Market System ("Nasdaq") halted trading in Adelphia stock before the markets opened.

11.     As a result of these revelations Adelphia closed at $5.70 on May 14, 2002, far from the Class Period high of $86.56 on May 19, 1999.

## JURISDICTION AND VENUE

12.     The claims alleged herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and 78t, and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder.

13.     The jurisdiction of this Court is based on Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1332.

14.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Many of the acts alleged herein, including the dissemination to the investing

public of the misleading statements and omissions at issue, occurred in substantial part in this District.  Adelphia also has its principal place of business in this District.

15.    In connection with the acts, transactions and conduct alleged herein, defendants used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of national securities exchanges and markets.

## PARTIES

16.    Plaintiff Charles Seebacher purchased shares of Adelphia common stock during the Class Period as set forth on the attached certification and was damaged thereby.

17.    Defendant Adelphia maintains its principal executive offices at One North Main Street, Coudersport, PA 16915-1141. Adelphia is the sixth-largest cable-television provider in the United States and trades on the Nasdaq under the ticker symbol "ADLAC."

18.    During the Class Period, Defendant John J. Rigas was the Chairman, President, Chief Executive Officer, founder, and controlling stockholder of Adelphia.  John J. Rigas has served as President or general partner of most of the constituent entities, which became wholly owned subsidiaries of Adelphia upon its formation in 1986, as well as the cable television operating companies acquired by the Company which were wholly or partially owned by members of the John J. Rigas family.  During the Class Period, John J. Rigas approved the Company's false and misleading press releases and signed the Company's year-end reports filed with the SEC during the Class Period.

19.    During the Class Period, Defendant Timothy J. Rigas was Executive Vice President, Chief Financial Officer, Chief Accounting Officer, Treasurer, and a director of Adelphia.  He is also Vice Chairman, Chief Financial Officer, Treasurer, and a director of

Adelphia Business.  Timothy J. Rigas signed the Company's quarterly and yearly financial reports filed with the SEC during the Class Period.

20.     During the Class Period, Defendant James P. Rigas was Executive Vice President of Strategic Planning and a director of Adelphia .  He also served as Vice Chairman, President, Chief Executive Officer, Chief Operating Officer, and a director of Adelphia Business. James P. Rigas signed the Company's year-end reports filed with the SEC during the Class Period.

21.     During the Class Period, Defendant Michael J. Rigas was Executive Vice President of Operations and a director of Adelphia.  He also served as Vice Chairman, Secretary, and a director of Adelphia Business.  Michael J. Rigas signed the Company's year-end reports filed with the SEC during the Class Period.

22.     Defendants John J. Rigas, Timothy J. Rigas, James P. Rigas, and Michael J. Rigas are sometimes referred to herein as the Individual Defendants.

23.     By reason of their positions with the Company, the Individual Defendants had access to internal Company documents, reports and other information, including adverse non-public information concerning the Company's business and financial condition, and attended management and/or board of directors meetings.  As a result of the foregoing, they were responsible for the truthfulness and accuracy of the Company's public reports and releases described herein.

24.     Adelphia and the Individual Defendants, as officers and directors of a publicly held company, had a duty to promptly disseminate truthful and accurate information with respect to Adelphia and to promptly correct any public statements issued by or on behalf of the Company that had become false and misleading.

25.    Each defendant knew or recklessly disregarded that the misleading statements and omissions complained of herein would cause the price of the Company's stock to become artificially inflated.  Each of the defendants acted knowingly or in such a reckless manner as to constitute a fraud and deceit upon plaintiff and the other members of the Class.

26.    Defendants are liable, jointly and severally, as direct participants in and co-conspirators of the wrongs complained of herein.

## CLASS ACTION ALLEGATIONS

27.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who purchased Adelphia common stock during the period from May 17, 1999 through and inclusive of May 14, 2002, and who suffered damages thereby (the "Class").  Excluded are the defendants, members of the defendants' families, any entity in which any defendant has a controlling interest or is a parent or subsidiary of or is controlled by the Company, and the officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns of any of the defendants.

28.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to the plaintiff at this time and can only be ascertained through appropriate discovery, the plaintiff believes there are, at a minimum, hundreds of members of the Class who traded during the Class Period.  The Company had in excess of 186.68 million shares of its common stock outstanding as of January 16, 2002.

29.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are whether:

      a)      the federal securities laws were violated by defendants' acts as alleged herein;

      b)      the Defendants issued false and misleading statements during the Class Period;

      c)      the Individual Defendants caused Adelphia to issue false and misleading statements during the Class Period;

      d)      the Defendants acted knowingly or recklessly in issuing false and misleading statements;

      e)      the market prices of Adelphia securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

      f)      the members of the Class have sustained damages and, if so, what is the proper measure of damages.

30.      Plaintiff's claims are typical of the claims of the members of the Class as plaintiff and members of the Class sustained damages arising out of defendants' wrongful conduct in violation of federal law as complained of herein.

31.      Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

32.      A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members

individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## FRAUD-ON-THE-MARKET PRESUMPTION

33.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine, in that:

a)    Defendants made public misrepresentations or failed to disclose material facts regarding Adelphia's business and financial condition during the Class Period;

b)    The omissions and misrepresentations were material;

c)    The common stock of the Company traded on the Nasdaq National Market System, an efficient and open market;

d)    The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock;

e)    Plaintiff and the members of the Class purchased their stock between the time defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the misrepresented facts; and

f)    Adelphia is followed by various analysts and news media.  At all relevant times, the price of Adelphia's stock reflected the effect of news disseminated in the market. 34.34.

Based on the foregoing, Plaintiff and the members of the Class are entitled to the presumption of reliance upon the integrity of the market.

## SUBSTANTIVE ALLEGATIONS

### Background

35.     John J. Rigas, Adelphia's founder, and his three sons (collectively the "Rigas family") are the controlling shareholders of Adelphia and hold approximately 91.3% the Company's voting power.  Each of John J. Rigas' three sons was a director and executive of the Company.

36.     The Rigas family also has controlling ownership interests in Managed Entities. Managed Entities are cable systems owned by the Rigas family and managed by Adelphia. Adelphia provides management and consulting services to these privately held partnerships, corporations, and limited liability companies which, in turn, pay fees to Adelphia and reimburse Adelphia for allocated corporate and administrative costs. Thus, the Rigas family controls both Adelphia and the Managed Entities.

37.     Adelphia and the Managed Entities have entered into co-borrowing arrangements, whereby either entity can borrow up to a total of $5.6 billion, with both entities liable for the borrowing made by either under the arrangement.

38.     Furthermore, the Rigas family owns the majority of shares of Adelphia's former subsidiary, Adelphia Business.  Adelphia Business was a telephone company spun-off by Adelphia on January 11, 2002.  The Individual Defendants were also directors and officers of Adelphia Business.  Adelphia Business filed for bankruptcy protection and reorganization under Chapter 11 on March 27, 2002 after it was unable to make a March 1, 2002 interest payment on a senior secured note.

### Defendants' Material Misstatements and Omissions

39.     On May 17, 1999, defendants issued a press release over the *PR Newswire*
reporting the Company's financial results for the first quarter ending March 31, 1999.  In the press
release the Company reported, in relevant part:

> First quarter results saw record levels of revenues of $206.2 million
> and operating cash flow of $89.8 million. Adelphia's net loss
> applicable to common stockholders for the first quarter totaled $50.2
> million, or $0.97 per share, compared with $46.3 million, or $1.51 per
> share, for the same period in the prior year.

Defendant John J. Rigas was quoted in the May 17, 1999 press release as stating:

> In addition to being very pleased with Adelphia's operating results
> for the quarter we were also very happy with the operating results of
> each of the companies being acquired.  The results for each
> company were fully in line with our expectations. Individually and
> collectively the companies continued to experience strong subscriber
> and cash flow growth in their cable television businesses.

Defendant Timothy Rigas was also quoted in the May 17, 1999 press release as stating:

> Simultaneous with the announcement of these acquisitions,
> Adelphia announced its intention to raise $750 million of common
> and preferred equity from the public and the Rigas family.  We are
> very pleased that the company has not only completed this activity
> but was able to increase the amount of common and preferred equity
> raised to over $1.4 billion.   As a result of raising this additional
> equity, the company's ratio of Debt to EBITDA, pro forma for the
> completion of all announced acquisitions, is below 6.9 times as of
> and for the three months ended March 31, 1999.

40.     On May 17, 1999, the Company filed with the SEC its Quarterly Report on Form
10-Q for the period ended March 31, 1999 (the "First Quarter 1999 10-Q"), reporting essentially
the same results reported in the May 17, 1999 press release.  Defendant Timothy J. Rigas signed
the First Quarter 1999 10-Q.

41.     On August 16, 1999, defendants issued a press release over the *PR Newswire*

10

reporting the Company's financial results for the second quarter ending June 30, 1999. In the

press release the Company reported, in relevant part:

> Second quarter results saw record levels of revenues of $226.3
> million and operating cash flow of $92.0 million. Adelphia's net
> loss applicable to common stockholders for the second quarter
> totaled $47.3 million, or $0.81 per share, compared with $48.3
> million, or $1.56 per share, for the same period in the prior year.

Defendant John Rigas was quoted in the August 16, 1999 press release as stating:

> [t]he company's investment in plant rebuilds and new product
> rollouts gained momentum with capital spending increasing 30%
> compared to the March 1999 quarter. I am looking forward to even
> more impressive operation results following the completion of these
> acquisitions later this year.

42.    On August 14, 1999, the Company filed with the SEC its Quarterly Report on

Form 10-Q for the period ended June 30, 1999 (the "Second Quarter 1999 10-Q"), reporting

essentially the same results reported in the August 16, 1999 press release. Defendant Timothy J.

Rigas signed the Second Quarter 1999 10-Q.

43.    On November 15, 1999, defendants issued a press release over the *PR Newswire*

reporting the Company's financial results for the third quarter ending September 30, 1999. In the

press release the Company reported, in relevant part:

> Third quarter results saw a record level of revenues of $242.3
> million and operating cash flow of $87.4 million. Adelphia's net
> loss applicable to common stockholders for the third quarter totaled
> $56.9 million, or $0.95 per share, compared with $43.1 million, or
> $1.21 per share, for the same period in the prior year.

Defendant John Rigas was quoted in the November 15, 1999 press release as stating:

> Adelphia's newly renamed subsidiary, Adelphia Business Solutions
> ("ABIZ") made tremendous strides during the quarter and has
> become an increasingly important component of revenue and

11

> EBITDA growth for Adelphia. Pro Forma for the above mentioned
> transactions, all cable operations and Adelphia Business Solutions
> markets which were in operation as of September 30, 1998
> (collectively the "Core Operations") revenue and EBITDA
> increased 12.4% and 18.8%, respectively. EBITDA Margins for
> Core Operations grew from 43.4% to 46.4%.

44.     On November 15, 1999, the Company filed with the SEC its Quarterly Report on

Form 10-Q for the period ended September 30, 1999 (the "Third Quarter 1999 10-Q"), reporting

essentially the same results reported in the November 15, 1999 press release. Defendant Timothy

J. Rigas signed the Third Quarter 1999 10-Q.

45.     On March 30, 2000, defendants issued a press release over the *PR Newswire*

reporting the Company's financial results for the fourth quarter and year ending December 31,

1999. In the press release the Company reported, in relevant part:

> Fourth quarter results saw a record level of revenues of $635.3
> million and EBITDA of $267.7 million. Adelphia's net loss
> applicable to common stockholders for the fourth quarter totaled
> $228.0 million, or $1.05 per share, compared with $44.5 million, or
> $1.06 per share, for the same period in the prior year
>
> ***
>
> For the quarter ended December 31, 1999 compared to December 31,
> 1998 pro forma revenues and EBITDA grew 10.4% and 11.4%
> respectively. Adelphia closed over $9 billion of previously announced
> acquisitions during the December quarter … These transactions
> represented cable systems serving over 2.7 MM customers. The
> company has successfully integrated these acquisitions. This was
> demonstrated by achieving consolidated cable EBITDA margins of
> 49.1% for the quarter ended December 31, 1999. The successful
> integration of these acquisitions was also evidenced by strong pro
> forma revenue growth for the most recent quarter. Revenues from
> cable operations grew from $589 MM in the September 1999 quarter
> to $605 MM in the December 1999 quarter.

Defendant Timothy Rigas was quoted in the March 30, 2000 press release as stating:

> Adelphia began 1999 by taking the bold steps of announcing
> several acquisitions which more than doubled the size of our cable
> operations and by announcing our plans to expand Adelphia
> Business Solutions from a regional to a national provider of data and
> telecommunications services.  We ended the year with complete
> success. We have effectively integrated each of the cable
> acquisitions into our existing operations and have achieved in our
> first quarter of operation nearly 100% of the cost savings that we
> believed we would be able to eventually achieve.  Additionally we
> exceeded all internal and external goals by growing our digital
> subscriber base to over 233,000 customers.  We achieved this
> considerable operational success during a time period in which
> management was also busy with the challenging tasks of
> transferring hundreds of franchises, integrating multiple business
> systems from the acquisition companies and welcoming thousands
> of new employees into the Adelphia family.

46.    On March 30, 2000, the Company filed its Annual Report on Form 10-K with the

SEC for the period ended December 31, 1999 (the "1999 10-K"), reporting essentially the same

results reported in the March 30, 2000 press release.  The Individual Defendants each signed the

1999 10-K.

47.    On May 15, 2000, defendants issued a press release over the *PR Newswire*

reporting the Company's financial results for the first quarter ending March 31, 2000.  In the press

release the Company reported, in relevant part:

> First quarter results saw record revenues of $672.7 million
> compared with $201.6 million for the quarter ended March 31,
> 1999, while EBITDA grew to $262.3 million compared with $85.2
> million for the quarter ended March 31, 1999.  Adelphia's net loss
> applicable to common stockholders for the first quarter totaled
> $115.9 million, or $.91 per share, compared with $50.3 million, or
> $0.97 per share, for the same period in the prior year.

Defendant Timothy Rigas was quoted in the May 15, 2000 press release as stating:

> Nearly 50% of our subscribers are now served by systems with
> greater than 5% new service penetration.  Our overall results, in

these markets have been particularly impressive. In addition to the direct revenue gains from the new services, we also achieved 3% annualized basic subscriber growth. We believe that the continuation of rolling out these new products to additional markets and continuing to build consumer awareness for them will be the most important factor in driving growth in the cable division for the rest of the year.

48.    On May 15, 2000, the Company filed with the SEC its Quarterly Report on Form 10-Q for the period ended March 31, 2000 (the "First Quarter 2000 10-Q"), reporting essentially the same results reported in the May 15, 2000 press release. Defendant Timothy J. Rigas signed the First Quarter 2000 10-Q.

49.    On August 14, 2000, defendants issued a press release over the *PR Newswire* reporting the Company's financial results for the second quarter ending June 30, 2000. In the press release the Company reported, in relevant part:

Second quarter results saw record revenues of $704.1 million compared with $218.8 million for the quarter ended June 30, 1999 while EBITDA grew to $273.2 million compared with $84.5 million for the quarter ended June 30, 1999. Adelphia's net loss applicable to common stockholders for the second quarter totaled $85.3 million, or $0.66 per share, compared with $47.3 million, or $0.81 per share, for the same period in the prior year. For the quarter ended June 30, 2000 compared to June 30, 1999 pro forma consolidated revenues and EBITDA grew 16.5% and 5.6%, respectively.

Defendant Timothy Rigas was quoted in the May 15, 2000 press release as stating:

We were pleased with our overall financial results during the second quarter especially with our pro forma consolidated revenue growth of 16.5%, which we believe places us among the leaders in our industry. At June 30 we totaled over 900,000 combined telephone lines, digital cable subscribers and high speed modem customers, a number which will grow past 1,000,000.

***

14

> Adelphia Business Solutions continues to deliver impressive results. Quarterly revenues increased to $80.2 million to for the June 2000 quarter, up 16% from the March 2000 quarter and up 134% from a year ago. We also saw record access line installations of 81,460 during the quarter. Combining this success with that of the cable operations allowed Adelphia to report over 16% revenue growth compared with last year. As Adelphia Business Solutions improves its operating margins, it will also begin contributing strongly to Adelphia's EBITDA growth.

50.    On August 14, 2000, the Company filed with the SEC its Quarterly Report on Form 10-Q for the period ended June 30, 2000 (the "Second Quarter 2000 10-Q"), reporting essentially the same results reported in the August 14, 2000 press release. Defendant Timothy J. Rigas signed the Second Quarter 2000 10-Q.

51.    On November 14, 2000, defendants issued a press release over the *PR Newswire* reporting the Company's financial results for the third quarter ending September 30, 2000. In the press release the Company reported, in relevant part:

> Third quarter results saw record revenues of $727.9 million compared with $232.3 million for the quarter ended September 30, 1999 while EBITDA grew to $280.3 million compared with $77.4 million for the quarter ended September 30, 1999. Adelphia's net loss applicable to common stockholders for the third quarter totaled $145.3 million, or $1.06 per share, compared with $56.9 million, or $0.95 per share, for the same period in the prior year. For the quarter ended September 30, 2000 compared to September 30, 1999, pro forma consolidated revenues and EBITDA grew 114.3% and 6.8% respectively.

Defendant Timothy Rigas was quoted in the November 14, 2000 press release as stating:

> The third quarter demonstrated continued success in both our cable and telephone subsidiaries. The combined financial results of our cable operations and Adelphia Business Solutions' original markets, were impressive. Together these operations delivered pro forma revenue and EBITDA growth of 12.1% and 13.0% respectively.

15

52.     On November 14, 2000, the Company filed with the SEC its Quarterly Report on

Form 10-Q for the period ended September 30, 2000 (the "Third Quarter 2000 10-Q"), reporting

essentially the same results reported in the November 14, 2000 press release.  Defendant Timothy

J. Rigas signed the Third Quarter 2000 10-Q.

53.     On April 2, 2001, defendants issued a press release over the *PR Newswire*

reporting the Company's financial results for the fourth quarter and year ending December 31,

2000.  In the press release the Company reported, in relevant part:

> Fourth quarter results saw record revenues of $804.6 million
> compared with $635.3 million for the quarter ended December 31,
> 1999 while EBITDA grew to $275.9 million compared with $267.7
> million for the quarter ended December 31, 1999.  Adelphia's net
> loss applicable to common stockholders for the fourth quarter totaled
> $255.8 million, or $1.73 per share, compared with $128.1 million,
> or $1.05 per share, for the same period in the prior year.
>
> * * *
>
> As a result of this growth and operating synergies associated with
> acquisitions that closed in the prior year Adelphia's cable operations
> achieved pro forma annual revenue and EBITDA growth rates of
> 7.7% and 12.6%, respectively, compared to the December 31, 1999
> year.
>
> Adelphia's subsidiary, Adelphia Business Solutions (Nasdaq:
> ABIZ), continued to make significant contributions to the
> Company's overall financial performance.  During the twelve
> months ended December 31, 2000, Adelphia Business Solutions'
> consolidated operating results included revenue growth of 127.7%
> to $352.0 million from $154.6 million and consolidated EBITDA
> losses of $106.2 million compared to $44.1 million in the prior
> period.

Defendant Timothy Rigas was quoted in the April 2, 2001 press release as stating:

> The year 2000 demonstrated continued success in both our cable
> and telephone subsidiaries.  The combined financial results of our

16

cable operations and Adelphia Business Solutions' original markets were impressive. Together these operations delivered pro forma revenue and EBITDA growth of 12.5% and 13.9%, respectively.

54.    On April 2, 2001, the Company filed its Annual Report on Form 10-K with the SEC for the period ended December 31, 20000 (the "2000 10-K"), reporting essentially the same results reported in the April 2, 2001 press release. The Individual Defendants each signed the 2000 10-K.

55.    On May 14, 2001, defendants issued a press release over the *PR Newswire* reporting the Company's financial results for the first quarter ended March 31, 2001. In the press release, the Company reported a first-quarter profit as a result of a $519 million pretax gain for exchanging systems with Comcast, Corp., a rival cable company. Specifically, the Company reported net income of $137.1 million, or 83 cents a share, compared with a loss of $115.9 million, or 91 cents per share, a year ago. Moreover, sales rose 25% to $838.2 million from $672.7 million. Defendant Timothy Rigas was quoted in the May 14, 2001 press release as stating, in relevant part:

> In the first quarter, Adelphia's cable operations experienced continued success…We are also pleased that we were able to achieve expected reductions in marketing expenditures compared with the December 31, 2000 quarter which contributed to overall higher margins in the current quarter. I am also very pleased to report a dramatic improvement in the EBITDA contribution from our subsidiary, Adelphia Business Solutions. We believe that the March 31, 2001 quarters marks an important inflection point, as it was the first time that Adelphia Business Solutions contributed positively to Adelphia's consolidated EBITDA growth rate. The improvements represented 35% of Adelphia's consolidated revenue growth of 13% and 30% of its consolidated EBITDA growth of 10%. These contributions should continue to accelerate during the remainder of this year and next.

17

56.    On May 15, 2001, the Company filed with the SEC its Quarterly Report on Form 10-Q for the period ended March 31, 2001 (the "First Quarter 2001 10-Q"), reporting essentially the same results reported in the May 14, 2001 press release. Defendant Timothy J. Rigas signed the First Quarter 2001 10-Q.

57.    On August 14, 2001 defendants issued a press release over the *PR Newswire* reporting the Company's financial results for the second quarter ended June 30, 2001. In the press release the Company reported "record revenues" of $893.3 million compared with $704.1 million for the quarter ended June 30, 2000. Moreover, EBITDA grew to $342.2 million compared with $272.1 million for the quarter ended June 30, 2000. Defendant Timothy Rigas was quoted in the August 14, 2001 press release as stating, in relevant part:

> In the second quarter, we continued our successful deployment of new services included the roll-out of our digital cable and high-speed cable modem products…I am also very pleased to report the continued improvement in the EBITDA contribution from our subsidiary, Adelphia Business Solutions. For the second consecutive quarter, Adelphia Business Solutions' contributed to Adelphia's consolidated EBITDA growth rate. The improvements represented 26% of Adelphia's consolidated revenue growth of 14% and 42% of its consolidated EBITDA growth of 14%….The turnaround in Adelphia Business Solutions' EBITDA growth trend combined with the Cable Division's steady performance has resulted in an acceleration of annual EBITDA growth from 7% a year ago and 10% last quarter to 14% in the current quarter.

58.    On August 14, 2001, the Company filed with the SEC its Quarterly Report on Form 10-Q for the period ended June 30, 2001 (the "Second Quarter 2001 10-Q"), reporting essentially the same results reported in the August 14, 2001 press release. Defendant Timothy J. Rigas signed the Second Quarter 2001 10-Q.

18

59.    On November 9, 2001 defendants issued a press release over the *PR Newswire*
reporting the Company's financial results for the third quarter ended September 30, 2001.  In the press
release the Company reported third quarter "record revenues" of $898.6 million compared with $727.9
million for the quarter ended September 30, 2000.  EBITDA increased to $357.1 million compared
with $280.3 million for the same quarter a year ago.  The Company also announced that the spin-off of
Adelphia Business Solutions, Inc.  The Company stated, in relevant part:

> Adelphia also announced today that its Board of Directors had
> authorized in principle the distribution of Adelphia's equity interest in
> Adelphia Business Solutions, Inc… a 79 percent owned subsidiary of
> Adelphia to Adelphia stockholders.  It is expected that the spin-off of
> its equity interest in [Adelphia Business] will occur no later than March
> 31, 2002.  In connection with its spin-off of its equity interest in
> [Adelphia Business], Adelphia may provide up to $100 million of
> additional credit support to [Adelphia Business] subsidiaries.

Defendant Timothy Rigas was quoted in the November 9, 2001 press release as stating:

> Continuing our strong performance in digital cable and data offerings,
> allows us to maintain our previously stated guidance of 11% to 12.5%
> for 2001 EBITDA growth.

60.    On November 9, 2001, the Company filed with the SEC its Quarterly Report on
Form 10-Q for the period ended September 30, 2001 (the "Third Quarter 2001 10-Q"), reporting
essentially the same results reported in the November 9, 2001 press release.  Defendant Timothy J. Rigas
signed the Third Quarter 2001 10-Q.

61.    The statements identified in paragraphs 39 through 60 above were materially false
and misleading when made because:

> a)    The Company failed to disclose $2.284 billion in off-balance sheet debt in

connection with co-borrowing arrangements backed by managed entities controlled by the Rigas family.

b)      The Company failed to disclose that as much as $1 billion borrowed by these entities were advanced to the Rigas family partnerships, which used the proceeds to purchase securities from Adelphia.  As a result, no real equity was created.

c)      Inclusion of this debt in the Company's balance sheet would have decreased Adelphia's net worth and shareholders' equity.

d)      Inclusion of this debt in the Company's balance sheet would have violated the Company's debt covenants, negatively affected the Company's corporate credit rating, and increased borrowing costs and restricted the Company's ability to borrow.

e)      The Company failed to disclose what assets, in addition to 300,000 of its cable subscribers, are backing up this debt.  As a result, the debt may be under collateralized.

### The Truth Begins To Emerge

62.     On March 27, 2002, the Company revealed that it has $2.284 billion in off-balance sheet debt, which was not previously disclosed.  A managed entity controlled by the Rigas family, Highland Holding, borrowed the money against credit facilities that were co-guaranteed by Adelphia. In a footnote near the end of Adelphia's press release announcing fourth quarter and year-end results for 2001, the Company reported:

> Certain subsidiaries of the Company are co-borrowers with certain companies owned by the Rigas Family and managed by the Company ("Managed Entities") for borrowing amounts up to $5,630,000.  Each of the co-borrowers is liable for all borrowing under the credit facilities and may borrow up to the full amount of the facilities.  Amounts borrowed under these facilities by the Company's subsidiaries are included as debt on the Company's consolidated balance sheet.

<u>Amounts borrowed by Managed Entities under the facilities are not included on the Company's consolidated balance sheet.</u> The Company expects the Managed Entities to repay their borrowings in the ordinary course. The Company does not expect that it will need to repay the amounts borrowed by the Managed Entities. <u>As of December 31, 2001, co-borrowing credit facilities balances, net of amounts otherwise reflected as debt on the Company's consolidated balance sheet, totaled approximately $2,284,000,000.</u> The related maturities of these amounts are as follows: approximately $0 in 2002, $26,000,000 in 2003 to 2005, $519,000,000 in 2006 and $1,739,000,000 thereafter.

(emphasis added).

63.    During a conference call with Wall Street analysts on March 27, 2002, defendant Timothy Rigas revealed that some of the proceeds borrowed by the Managed Entities "were advanced to the Rigas family partnership, which used the proceeds to purchase various securities from Adelphia."

64.    An article in *TheStreet.com* on March 27, 2002 quoted a fund manager as stating "Adelphia is further encumbering their assets to lend money to a purchaser of Adelphia equity…[i]t's smoke and mirrors. No real equity was created."

65.    On March 28, 2002, *The New York Times* reported that the Rigas family appears to have borrowed $1 billion or more in loans guaranteed by the Company and used the money to purchase Adelphia stock and bonds.

66.    Furthermore, the Company filed a Form 8-K with the SEC on March 28, 2002, relating to the bankruptcy filing of Adelphia Business. Specifically, the Company revealed that it might be liable to repay $500 million in borrowings by Adelphia Business under a joint credit facility whereby the Company guaranteed the borrowings of Adelphia Business. In addition, the Company revealed that it had given Adelphia Business $36.8 million on an unsecured basis prior to the

21

bankruptcy filing and may be unable to recover that debt.

67.    As a result of these revelations, the Company's stock price plummeted almost 18% or $3.69 on March 27, 2002 to close at $16.70.  Subsequently on March 28, 2002 the stock price fell an additional 11% or $1.80 to close at $14.90, erasing more than $1 billion in market capitalization. Moreover, an article in the *Wall Street Journal* on March 29, 2002 raised concerns regarding collateral for the $2.284 billion debt.  The article reported that Highland Holdings, which owns 300,000 subscribers, is not sufficient to cover the debt.  As such, the Company has not disclosed the collateral for a significant portion of the debt.

68.    On April 1, 2002, Adelphia issued a press release announcing it was requesting an extension in filing its Annual Report on Form 10-K with the SEC.  Specifically, the Company stated that the extension was to allow the Company and its outside auditors an opportunity "to review certain accounting matters relating to co-borrowing credit facilities which Adelphia is party to."

69.    On May 2, 2002, Adelphia announced that it would likely restate its financial results for 1999, 2000, and 2001.  Specifically, the Company reported that it has "tentatively concluded that it should reflect borrowings and related interest expense under certain co-borrowing arrangements…as liabilities in its consolidated financial statements, with a corresponding decrease in shareholders' equity."

70.    Then, on May 15, 2002 before the markets opened, defendant John J. Rigas resigned as Chairman and CEO of the Company. Defendant Timothy Rigas also resigned as CFO, chief accounting officer, and treasurer the following day.  The Company also announced that it would conduct an internal investigation into the issues raised in connection with the preparation of its 10-K statement - namely the public and private related-party dealings.  Moreover, the Company suspended

an audit conducted by Deloitte & Touche, LLP, the Company's outside auditors. Furthermore, Nasdaq halted trading in Adelphia stock before the markets opened.

71.    As a result of these revelations Adelphia closed at $5.70 on May 14, 2002, far from the Class Period high of $86.56 on May 19, 1999.

72.    Adelphia is also the subject a formal investigation by the SEC as well as criminal investigations by the U.S. Attorney's Offices in New York and Pennsylvania in connection with the Company's accounting practices and related-party transactions.

### ADDITIONAL SCIENTER ALLEGATIONS

73.    As alleged herein, defendants acted with scienter in that defendants knew that the statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated in or acquiesced to the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Adelphia, their control over and/or their associations with the Company which made them privy to confidential proprietary information concerning Adelphia, participated in the fraudulent scheme alleged herein.

### GAAP/SEC REGULATION VIOLATIONS

74.    The financial statements and related press releases by the Company identified above were materially false and misleading when made. The Company has been forced to restate its financial results during the Class Period because, contrary to its earlier statements, those results did not comply with GAAP.

75.    The SEC requires that publicly-traded companies present their financial statements in accordance with GAAP.  17 C.F.R. § 210.4-01(a)(1).  Financial statements filed with the SEC that are not prepared in accordance with GAAP "will be presumed to be misleading or inaccurate, despite footnote or other disclosures, unless the Commission has otherwise provided."  17 C.F.R. § 210.4-(a)(1).

76.    Defendants' failure to disclose the $2.284 billion off-balance sheet debt in connection with co-borrowing arrangements with managed entities violated, *inter alia*, the following GAAP principles:

a)    the principle that a conservative approach be taken providing early recognition of unfavorable events and minimizing the amount of income reported.  (See Statement No. 4 of the Accounting Principles Board ("APB Nos") at 4 ¶¶ 28, 35, 171);

b)    the principle that the financial information presented should be complete.  (See APB No. 4, ¶¶ 28, 35, 88, 171);

c)    the principle of fair presentation ("presents fairly").  (See APB No. 4, ¶¶ 109, 138, 189);

d)    the principle of adequacy and fairness of disclosure.  (See APB No. 4, ¶¶ 81, 106, 189, 199);

e)    the principle of materiality concerning information that is significant enough to affect evaluations or decisions. (See APB No. 4, ¶¶ 25, 128);

f)    the principle that the substance of transactions rather than form should be reflected. (See APB No. 4, ¶¶ 25, 35, 127);

g)    the principle that the financial statements contain and disclose relevant,

understandable, and timely information for the economic decisions of the user. (See APB No. 4, ¶¶ 23, 88, 89, 92);

      h)     the principle that the financial statements provide reliable financial information about the enterprise for the economic decisions of the user. (See APB No. 4, ¶¶ 77, 78, 107, 108); and

      i)     the principle that a restatement of a previously issued financial statement is allowed only when there was a material error, oversight or misuse of facts that existed at the time the financial statements were prepared. (See APB No.20, ¶¶ 13,74; FASB Statement of Concepts No. 16).

## THE SAFE HARBOR PROVISION IS INAPPLICABLE

77.     The statutory safe harbor under the Private Securities Litigation Reform Act of 1995, which applies to forward-looking statements under certain circumstances, does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Adelphia who knew that those statements were false when

they were made.

## COUNT I

## VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5

78.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

79.    This Count is asserted against all defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

80.    During the Class Period, defendants, singly and in concert, directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class, and failed to disclose material information in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiff and the other members of the Class.  The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce Plaintiff and the other members of the Class to purchase Adelphia common stock during the Class Period at artificially inflated prices.

81.    Throughout the Class Period, Adelphia acted through the Individual Defendants, whom it portrayed and represented to the financial press and public as its valid representatives.  The willfulness, motive, knowledge, and recklessness of the Individual Defendants is therefore imputed to Adelphia, which is primarily liable for the securities law violations of the Individual Defendants.

82.    As a result of the failure to disclose material facts, the information the defendants

disseminated to the investing public was materially false and misleading as set forth above, and the market price of Adelphia common stock was artificially inflated during the Class Period. Unaware of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by said defendants, Plaintiff and the other members of the Class relied, to their detriment, on the integrity of the market price of the stock in purchasing Adelphia common stock. Had Plaintiff and the other members of the Class known the truth, they would not have purchased said shares or would not have purchased them at the inflated prices that were paid.

83.    Plaintiff and the other members of the Class have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

84.    By reason of the foregoing, defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) failed to disclose material information; and/or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class in connection with their purchases of Adelphia common stock during the Class Period.

**COUNT II**

**VIOLATION OF SECTION 20(a)**
**OF THE EXCHANGE ACT**

85.    Plaintiff repeats and realleges each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

86.    The Individual Defendants, by virtue of their positions, stock ownership and/or

specific acts described above, were, at the time of the wrongs alleged herein, controlling persons within the meaning of Section 20(a) of the Exchange Act.

87.    The Individual Defendants had the power and influence and exercised the same to cause Adelphia to engage in the illegal conduct and practices complained of herein.

88.    By reason of the conduct alleged in Count I of the Complaint, the Individual Defendants are liable jointly and severally and to the same extent as the Company for the aforesaid wrongful conduct, and are liable to Plaintiff and to the other members of the Class for the substantial damages which they suffered in connection with their purchases of Adelphia common stock during the Class Period.

WHEREFORE, Plaintiff, on his own behalf and on behalf of the Class, prays for judgment as follows:

A.    Declaring this action to be a proper class action and certifying Plaintiff as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all defendants, jointly and severally, for the damages sustained as a result of the wrongdoings of defendants, together with interest thereon;

C.    Awarding Plaintiff the fees and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys and experts;

D.    Granting extraordinary equitable and/or injunctive relief as permitted by law, equity and federal statutory provisions sued on hereunder, and

E.    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a jury trial of all issues so triable.

Date:  May 28, 2002

                              Respectfully submitted,

                              **BERGER & MONTAGUE, P.C.**


                              By:_____
                                   Sherrie R. Savett
                                   Robin Switzenbaum
                                   1622 Locust Street
                                   Philadelphia, PA 19103
                                   (215) 875-3000

                              **CHITWOOD & HARLEY**
                              Martin D. Chitwood
                              Nikole M. Davenport
                              David A. Bain
                              2900 Promenade II
                              1230 Peachtree Street, N.E.
                              Atlanta, Georgia 30309
                              (404)873-3900

                              **Counsel for Plaintiff and the Class**

350801.wpd